HALSEY M. BARRETT, receiver of the Middlesex County Bank,

v.

THE PERTH AMBOY SHIPBUILDING AND ENGINEERING CO.

[Decided July 31st, 1907.]

A corporation under contract to construct a vessel for a company became unable for want of funds to proceed, and it suspended business. The company had paid installments called for, except $9,000 of an installment, which was withheld because of the unwillingness of the company to trust the corporation. The corporation mortgaged its property to the company for an amount in excess of the contract price to enable the company to raise money to meet the further payments called for. The company paid the $9,000, and later advanced $1,500. The financial condition of the corporation was known to the company.—*Held*, that though the parties in good faith expected that the giving of the mortgage would enable the corporation to continue its business, the mortgage was given in expectation of insolvency, and was void, under the Corporation act of 1896 (*P. L. p. 298 § 64*), declaring that conveyances by insolvent corporations shall be void, except as to the $1,500 advanced.

On final hearing on cross-bill and answer thereto.

This cause was before the court on final hearing between the complainant's predecessor in office and the defendant, as reported *sub nom. Campbell v. Perth Amboy Shipbuilding and Engineering Co., 70 N. J. Eq. (4 Robb.) 40,* and on appeal was affirmed, as reported in *71 N. J. Eq. (1 Buch.) 302.*

That decision left undecided an issue raised by bill and cross-bill between the receiver of the Perth Amboy Shipbuilding and Engineering Company and the receiver of the Nautical Preparatory School, both being defendants.

The issue raised by those pleadings was as to the validity of a mortgage given by the shipbuilding company to the Nautical Preparatory School on the 18th day of June, 1903. The testimony on that issue had been taken at the hearing on the main cause, but its determination was postponed by consent of counsel until after the final determination of the validity of the first mortgage held by .the receiver of the Middlesex County Bank.

That matter having been determined by the court of errors and appeals argument was had upon the issue between the two defendants just named.

*Mr. Adrian Lyon,* for the receiver of the Perth Amboy Shipbuilding and Engineering Company.

*Mr. Alan H. Strong,* for the receiver of the Nautical Preparatory School.

PITNEY, ADVISORY MASTER.

The execution of the mortgage by the Perth Amboy Shipbuilding and Engineering Company to the Nautical Preparatory School was admitted. It was also admitted that no payment had ever been made thereon. Its validity is attacked by counsel for Mr. Voorhees as receiver of the Perth Amboy Shipbuilding Company on the ground that it was made in contravention of section 64 of the Corporation act (*P. L. 1896 p. 298*), as follows:

"SEC. 64. Whenever any corporation shall become insolvent or shall suspend its ordinary business for want of funds to carry on the same, neither the directors nor any officer or agent of the corporation shall sell, convey, assign or transfer any of its estate, effects, choses in action, goods, chattels, rights or credits, lands or tenements; nor shall they, or either of them, make any such sale, conveyance, assignment or transfer in contemplation of insolvency, and every such sale, conveyance, assignment or transfer shall be utterly null and void as against creditors; *provided,* that a *bona fide* purchase for a valuable consideration, before the corporation shall have actually suspended its ordinary business, by any person without notice of such insolvency or of the sale being made in contemplation of insolvency, shall not be invalidated or impeached."

This section was under consideration by the court of errors and appeals in the *Empire State Trust Co.* v. *Trustees of Wm. F. Fisher & Co., 67 N. J. Eq. (1 Robb.) 602,* where a mortgage given by a creditor corporation in embarrassed circumstances to a creditor for a loan of cash previously made was held void under our statute, although not void under the National Bankruptcy law.

(Perhaps it will not be deemed out of place for me to say here that at the hearing of that cause in this court the counsel for the trustee in bankruptcy distinctly disavowed any assistance from the state statute, but placed himself entirely on the section of the National Bankruptcy act.)

Coming now to the present case. The solution of the question whether the receiver of the mortgagor has brought himself within the purview of the statute just quoted involves a consideration of the history of the shipbuilding company and, in a measure, that of the Nautical Preparatory School.

As mentioned and set forth in the former opinion in this cause, Hugh Ramsay died seized of the mortgaged premises intestate, leaving a widow and several children, one of whom was at that time an infant.

His principal indebtedness, about $50,000, was that to the Middlesex County Bank, then in the hands of a receiver, Mr. Edward S. Campbell, and was secured by three mortgages, the validity of which was contested and settled in the previous part of this suit.

In addition to that mortgage indebtedness he owed a few thousand dollars for taxes. He had been a successful shipbuilder and had a large and valuable plant at Perth Amboy. After his death his widow and adult children conceived the idea of organizing a corporation to continue the business. With this view the Perth Amboy Shipbuilding and Engineering Company was organized, with a large nominal capital.

Proceedings were taken in the orphans court by the widow, who was administratrix, to have the lands sold to pay the debts, and the whole of this valuable plant and, I infer, machinery on it, was sold for the amount of the encumbrances, and ultimately

transferred to the shipbuilding company without the payment of a dollar in cash.

Then one or more of his sons attempted to carry on the shipbuilding business under the name of the corporation. They had not a dollar of working capital. It sufficiently appears that they attempted to raise money by floating coupon bonds, secured by a mortgage on the plant, but met with no success.

About the same time a project was started in and about Providence, Rhode Island, for the establishment of a nautical school, being in substance an ordinary high school established on board a ship, which should be navigated about the waters of our coast and perhaps elsewhere, where the pupils could receive, in addition to an ordinary college education, special instruction in navigation.

This affair took the shape also of a corporation with, so far as appears, little or no capital, and it in turn, sooner or later, resorted to floating bonds.

In the meantime, relying on a few thousand dollars actually received upon the issue of either bonds or stock or benevolent gifts, it sought parties willing to undertake to build it a ship, and in that manner was brought into contact with the Perth Amboy Shipbuilding Company. The result was that a contract was entered into between the shipbuilding company and the school company on the 29th day of October, 1902, for the building of a ship, called the "Young America," for the sum of $202,-000, to be delivered on the 20th day of August, 1903.

This sum was to be paid as follows: $25,000 cash at the date of the contract; $25,000 on January 15th, 1903; $25,000 on April 15th, 1903; $25,000 on delivering the vessel, and the balance, $102,000, was to be paid in a sixty-day promissory note, with interest, payable at the Union Trust Company of Providence.

The scheme of the shipbuilding company was that they could manage to carry on the business either by the sale of their bonds, or, failing therein, upon credit based on the great value of the plant and the contract which they had with the school company. Its banker in Perth Amboy was the Perth Amboy Trust Company, and that bank agreed orally to give them a running credit

of $25,000 on the strength of their contract with the school
company. But out of abundant caution the Perth Amboy Trust
Company, following the usual fashion of bankers, corresponded
with the Union Trust Company of Providence as to the credit
of the school company and on the strength of that correspond-
ence they later on declined to continue the credit to the ship-
building company.

At the execution of the contract, instead of receiving $25,000,
the Nautical Preparatory School was able to pay only $15,000,
and when the next $25,000 came due on January 15th, 1903,
only $5,000 was paid and on January 20th another $5,000; the
total paid to that date was $25,000 instead of $50,000, as was
called for by the contract.

On February 24th, 1903, a supplemental agreement as of
February 21st was made and $25,000 was paid. That supple-
mental agreement was a modification of the agreement of Octo-
ber 29th, 1902. By it the time of the delivery of the ship was
postponed from August 20th to September 27th, 1903, and the
payment due on January 15th was postponed to February 21st.

In the meantime the shipbuilding company had further com-
plicated itself by entering into a contract with Colonel Wheeler,
assistant quartermaster-general of the United States, for the
building of two harbor steamers, one in four months and one in
five months. The contract was dated January 24th, 1903, and
approved by the war department, at Washington, on the 3d of
February.

The shipbuilding company immediately purchased and had in
its yards a large amount of material to put into these vessels and
therein incurred a heavy indebtedness. It also employed a large
pay-roll of artisans to work upon the vessels.

In the meantime the next payment was due from the school
company on April 15th, but was not paid. Payments on account
thereof were made as follows: May 2d, $10,000; May 25th,
$1,000; May 29th, $1,000; June 4th, $2,000; June 6th, $2,000;
total, $16,000. It abundantly appears by the letters of Lieu-
tenant-Commander Charles H. Harlow, of the United States
Navy, who was president of the school company, on board the

United States steamship "Raleigh" at first, at the navy yard at Portsmouth, New Hampshire, and later on at the navy yard at New York, that the school company was very much embarrassed for funds and unable to meet its third payment.

The shipbuilding company was unable to proceed with the work on any of its ships for want of funds to meet its pay-roll. It made a strenuous and desperate but unsuccessful effort to induce the assistant quartermaster-general to advance some money on the strength of the work done on the two government vessels, but he declined.

A scheme was then devised to create an asset which would enable the school company to raise money to pay the balance on $9,000 due on its third payment and provide funds for further payments on account of its contract to an amount exceeding the amount of cash provided for in the original agreement. That scheme was as follows: That a mortgage should be made by the shipbuilding company upon its valuable plant to the school company in the sum of $150,000 to be composed substantially as follows: $100,000 covering the original $100,000 cash payment provided for in the original contract, and $50,000 additional cash provided for covering that much of the promissory note of $102,000 to be given when the ship was finished, leaving to be paid by note $52,000. With that mortgage in its hands the nautical school expected to be able to raise money to meet the fourth payment of $25,000 to fall due under the original contract on the delivery of the vessel and also the additional cash payment of $50,000 to be substituted or applied in reduction of the promissory note of $102,000.

As a part of the transaction for the giving of the mortgage the school company was to raise and pay in cash the $9,000 still remaining due on its third cash payment of $25,000. As a part of the scheme the delivery of the vessel was to be postponed until May 1st, 1904. That agreement and arrangement was embodied in a recital in the mortgage now in question, which was dated June 18th, 1903, and verified by Mr. Eiswald, the vice-president of the school company, on the 19th of June in a special affidavit. That recital is as follows:

"WHEREAS, The said party of the first part has entered into a contract with the said party of the second part for the building of the vessel Young America to be delivered on or before the twenty-seventh day of September, in the year nineteen hundred and three, at the price' therein mentioned; and

"WHEREAS, Certain amounts have already been paid by the said party of the second part to the said party of the first part on account of said contract for, the construction of said vessel; and

"WHEREAS, Other amounts for a like purpose will hereafter be paid on account of said contract, making the aggregate amount of such payments made and to be made on account of said contract the sum of one hundred thousand dollars ($100,000) upon the delivery of said vessel; and

"WHEREAS, Said party of the second part has agreed and does agree to advance as loans to the said party of the first part certain sums of money, as follows:

| | | |
|---|---|---:|
| 1903— | August 15 | $11,666.66 |
| | September 1 | 5,000.00 |
| | October 1 | 10,000.00 |
| | November 1 | 5,000.00 |
| | December 1 | 1,666.67 |
| 1904— | January 2 | 6,666.67 |
| | February 1 | 5,000.00 |
| | March 1 | 5,000.00 |

aggregating the sum of fifty thousand ($50,000) dollars, such sums so advanced and loaned to be used specifically for the construction of and the payment for materials, labor and services in and about the construction of said vessel Young America, and to further pay on account of the said contract on the fifteenth day of February, nineteen hundred and four, the sum of fifteen thousand dollars, and on the fifteenth day of March, nineteen hundred and four, the sum of ten thousand dollars, and upon May 1st, nineteen hundred and four, to deliver its certain promissory note for fifty-two thousand ($52,000) dollars, payable sixty days after date, the balance of the purchase and contract price of said vessel, whereby the said party of the first part may become justly indebted to the said party of the second part in the sum of one hundred and fifty thousand ($150,000) dollars and interest thereon, as hereinafter stated; and

"WHEREAS, Such advances and an indebtedness are secured to be paid to the said party of the second part by the certain bond or obligation of the said party of the first part, bearing even date with these presents, in the penal sum of three hundred thousand ($300,000) dollars, lawful money as aforesaid, with a condition thereunder written that if the said party of the first part shall well and sufficiently construct and deliver the said vessel Young America on May 1st, 1904, shall forthwith upon demand repay to the said party of the second part such sums as shall have been loaned to the said party of the first part as aforesaid, and also such sums as have been paid to the said party of the first part as aforesaid by the said party of the second part on account of the said contract for the construction of said vessel, together with lawful interest upon such several sums from the dates of such payments and advances, re-

spectively, then said obligation to be, void, otherwise to be and remain in full force and virtue, as by reference to the said bond, or obligation and the condition thereof, reference being thereunto had may more fully appear."

Two days after the date and one day after the delivery and record of that instrument, $9,000 was paid which was the balance due on the third payment of $25,000 then in arrears from the school company to the shipbuilding company. This aspect of the affair is distinctly stated by the shipbuilding company in its answer and is recognized by Mr. Eiswald in his affidavit annexed to the mortgage stating the consideration. It is to be observed that though it is not mentioned in the mortgage yet as a matter of fact and in law I find that it was actually made as payment of the balance of $9,000 due from the school company to the shipbuilding company on the payment of $25,000 due under the original contract on April 15th.

Moreover, there was no provision in the contract of October 29th, 1902, or the supplement and modification of February, 1903, providing that the several payments of $25,000, except the last payment, should be conditioned or contingent upon the construction of the vessel having reached any particular stage of progress. In point of fact a great deal of work had been done upon the vessel. The terms of the contract in this respect, however, were manifestly in favor of the school company, since upon the completion of the vessel only one-half of it was to be paid in cash.

It follows, then, that this $9,000 has the same standing in the mortgage here in controversy that the previous payments have, with the single exception that it was held back and not made until after the mortgage was executed.

The only other money advanced by the school company was a promissory note or due bill for $1,500, dated July 17th and paid on August 15th. No attempt was made to raise the payment due on that day, amounting to $11,666.66, and the shipbuilding company was unable to go on with its business.

After the expenditure of the $9,000 received on the 20th day of June, and after the failure to obtain an advance from the government on account of the government ships, a conference

was had with the counsel of the Nautical School Company, Mr. Semple, in New York, and it was agreed that the shipbuilding company should go into insolvency, a receiver be appointed and authority obtained from the court for the receiver to proceed with the construction and finishing of the vessel with funds to be advanced by the Nautical School Company. The result of this meeting in New York was the appointment of Mr. Willard P. Voorhees as such receiver as a person entirely satisfactory to the Nautical School Company, he being in fact nominated by that company. Nothing was ever accomplished in the way of undertaking to finish the vessel, and on the 21st day of October, 1904, Mr. Newhall, of Providence, Rhode Island, was appointed receiver by the supreme court of Rhode Island, of the Nautical Preparatory School. He thereafter filed an answer to the shipbuilding company's cross-bill.

Now, we come to the question, what was the pecuniary condition of the shipbuilding company when this mortgage was given?

There is no proof that it had been sued by any creditor, but that it was absolutely unable to proceed and conduct its ordinary business without pecuniary aid is an indisputable fact in the case.

It was also, at the time, considerably indebted, as shown by the balance sheet, for materials purchased, and it had no pecuniary credit.

I am unable to perceive any material difference between its condition at that time and the condition of the Fisher company in the case above cited, on the day on which the mortgage there in question was given, as set forth on page 604 of 67 N. J. Eq. (1 Robb.). It had no available assets and it had no pecuniary credit and it had suspended its ordinary business for want of funds to carry on the same.

That this condition of things was known to the Nautical School Company is quite clearly shown. It was a subject of conversation and correspondence between the officers of the two companies and it is impossible to consider the mortgage itself, in connection with the known condition of the mortgagor, without feeling a conviction that it was given in expectation of insolvency, and to secure the mortgagee for the money already invested in the contract of October 29th, 1902. One of the reasons

given by the school company for withholding the payment of $9,000 was that they were unwilling to trust the shipbuilding company.

Nor can I see any ground for holding the mortgage valid on the ground that the parties in good faith expected that the result of giving it would be that the shipbuilding company would be able to go on and finish the ship and be relieved from its situation of practical insolvency. Undoubtedly if the additional $125,000 had been advanced at or about the time of the giving of the mortgage or shortly thereafter, the parties would have been justified in supposing that the scheme on which it was attempted to be based would probably work fully out and relieve the shipbuilding company from its then present embarrassment. But there was no ground for believing that the payment of $9,000 would so relieve the shipbuilding company, and the next payment under the mortgage was not due until the middle of August and then only to the extent of $11,666.66.

Undoubtedly the school company hoped, or pretended to hope, that it would be able to raise money upon this mortgage according to the scheme which I have previously mentioned, but in this it was entirely unsuccessful, and we have its officers and counsel at or before the first day of August advising and inducing the shipbuilding company to go into insolvency and that was two weeks or thereabouts prior to the time fixed for this first payment under the mortgage.

The circumstances of the case do not bring it within the principle upon which Vice-Chancellor Stevens sustained the mortgage in *Regina Music Box Co.* v. *Otto & Sons,* 65 *N. J. Eq.* (20 *Dick.*) 582.

My conclusion, therefore, upon the whole matter is that the mortgage is clearly invalid unless it be to the extent of $1,500, advanced in the due bill of that amount of July 15th, and as to that I will advise that it stand valid, but will advise no costs for either side.